OPINION OF THE COURT
Gerald Esposito, J.
Motion by defendant for summary judgment to dismiss plaintiffs complaint is decided in accordance with the following:
*853 In this action, the plaintiff seeks recovery for an injury he sustained, to his wrist on August 24, 1999. On that date, the plaintiff was employed as a police officer with the New York City Police Department in the Tracer Unit, in the 48th Precinct, Bronx, New York. The Tracer Unit concentrates on drug enforcement tactics within problem areas of a given precinct. As stated in the affirmation in opposition, the plaintiffs version of how he was injured is as follows:
“During the course of his tour [of duty] on August 24, 1999, the Tracer Unit was involved in a street narcotics enforcement unit operation. The target of this operation was drug sales which were taking place in front of defendant’s building . . . [The p]laintiff was stationed on the roof of an adjacent building observing activities taking place in front of [the building when he] observed a male Latino [later revealed to be Mel Apodaca, the brother of one of the tenants in the building] conducting drug sales . . . [The drugs were being stored in a] baby carriage . . . [The plaintiff] relayed this information to his partner [who then entered a radio patrol car with two other officers]. When Mr. Apodaca observed the patrol car approaching the premises, he fled into the building, followed shortly thereafter by the three police officers . . . [The plaintiff] left the adjacent rooftop ... to assist in the apprehension. While en route to the front of 2220 Adams Place, [the plaintiff] heard his fellow officers calling for help on the police radio . . . Upon arriving at the front door of 2220 Adams Place, [the plaintiff] found that the outer door to the premises was locked. The building had a vestibule area with a door communication intercom system to permit tenants to buzz open the interior entry door to the hallway of the premises . . . [The plaintiff] began yelling and knocking on the windows of the adjoining apartment in the hope that someone would open the outer door . . . Realizing that he could no longer stand by and wait for someone to open the locked door for him, [the plaintiff] broke the glass in the door with his portable radio and put his hand through the glass to unlock the door. Unfortunately, in the course of this process, [the plaintiff] seriously injured himself, suffering a severe laceration to the right hand and wrist . . . After gaining access to the vestibule, a *854 second officer came by and, time being of the essence, broke the glass to the interior door and the two officers entered the premises and proceeded to the fifth floor to assist in the arrest of Mr. Apodaca.”
As stated in plaintiffs examination before trial, a copy of the transcript of which is annexed to the moving papers as exhibit D (hereinafter referred to as plaintiffs tr.), the incident took place between 11:30 and 12:00 p.m. (Plaintiffs tr. at 27.) He did not recall the address of the adjacent building where he was stationed on the date of the incident. He was there as part of the street narcotic enforcement unit which would observe drug sale transactions and arrest the individuals involved. (Plaintiffs tr. at 11.) He did not recall how many police officers were involved in this operation on the date in question. Plaintiff knew that there was a program entitled the “Clean Halls” program whereby a landlord would execute an affidavit requesting that individuals be arrested as trespassers if they are present in the building but are not there as tenants or visitors. He did not know whether, as part of that program, the landlord would have to supply the police department with keys to the building, and did not know if the defendant was a member of the “Clean Halls” program; however, he did know police officers who did have keys to buildings. (Plaintiffs tr. at 21.) When the decision was made to arrest Mr. Apodaca, the plaintiff radioed the information to his partner. Plaintiffs partner “went down the street. He was in a marked radio motor patrol car. Mr. Apodaca saw him coming down the street. He fled inside the building. [Plaintiffs] partner attempted to get in. And he got in. He got in with [two other officers].” (Id. at 25.) Plaintiff described the locked outer front door as being a wire mesh steel door. (Id. at 29.) To gain entry to the building the plaintiff “struck the window with [his] radio and then at that point [he] severed [the] nerve on [his] hand.” (Id. at 30.) When asked if he actually injured his hand while he was putting the radio through the window, the plaintiff answered, “Yes.” (Id. at 31.) Mr. Apodaca was subsequently apprehended, tried and convicted of criminal sale of a controlled substance. (Id. at 38-39.)
Plaintiff alleges two causes of action in his complaint. The first cause of action seeks recovery based on common-law negligence. The second cause of action seeks recovery pursuant to General Municipal Law § 205-e. Briefly stated, plaintiff contends that the defendant was negligent in two respects: the first is in allowing criminal activity to be transacted on its premises, and the second is in locking the outer vestibule door.
*855 On October 23, 2001, Ms. Catherine Macri testified at an examination before trial on behalf of the defendant. A copy of her testimony is annexed to the moving papers as exhibit E (hereinafter referred to as tr.). Briefly stated, Ms. Macri testified that she is the president of the defendant corporation. (Tr. at 7.) She is also employed by Cosmopolitan Property Management, Inc., as its president. Cosmopolitan is employed by the defendant as its managing agent and was the managing agent at the time the plaintiff was injured. (Tr. at 6.)
The address 2220 Adams Place, Bronx, New York, is a multifamily residential building with 15 units, 3 on each floor. (Tr. at 11.)
In 1996, Ms. Macri enrolled this building in the police department’s “Clean Halls” program because the block where the building is located was experiencing “a lot of drug activity.” (Tr. at 13.) The program requires that the police department be given an affidavit of enrollment, keys to the building, and a list of tenants, every three months. “In return, the police department is supposed to watch the building for you. Make their rounds, arrest anyone who’s loitering in front of the building, who does not belong there, who cannot prove that they belong in the building.” (Tr. at 13-14.)
A tenant named Lisa Cosme resided in unit E3, on the fifth floor, at the time the plaintiff was injured. She had resided in the building since 1994. While Ms. Macri did not receive any complaints from tenants or the police regarding Ms. Cosme, the superintendent of the building told her that Ms. Cosme’s brother had been released from jail, and as a result thereof, “there was drug activity and people hanging out in front of the building.” (Tr. at 16.) Ms. Macri contacted the police and gave them all the information which was available to her. She also telephoned Ms. Cosme and informed her that the superintendent had advised her that Ms. Cosme’s brother had been released from prison and that there was drug activity “going on” in front of the building, “and perhaps that was her brother.” (Id.) Ms. Macri asked Ms. Cosme not to stay in front of the building. Ms. Cosme responded that her brother was leaving and that she would talk to him about it. (Tr. at 17.)
Ms. Macri testified about why the outer door was locked on the night of the incident in which the plaintiff sustained his injuries. She stated that the tenants agreed to have the outer door locked after 10:00 p.m. to avoid loitering and drug sales occurring between the outer and inner doors of the building *856 entrance. Tenants were able to exit the building without a key but no one could enter the inner vestibule without a key. (Tr. at 23.) The key to the inner door also opened the outer door. (Tr. at 25.)
With respect to plaintiffs first cause of action for common-law negligence, plaintiff contends that the defendant created a dangerous condition, had actual notice of the condition, and failed to remedy it, when defendant did not move to evict Ms. Cosme from her apartment after Ms. Cosme’s brother was released from prison and began “hanging out” in front of the building. Plaintiff further contends that defendant’s locking of the outer vestibule door constitutes negligence per se in that it constitutes a violation of Multiple Dwelling Law § 50-a. Consideration of defendant’s statutory violation will be discussed infra in this opinion.
It is plaintiff’s contention that “defendant’s failure to take any action against the tenant . . . who was housing a known drug offender, other than a phone call to the police, could be construed by a reasonable person as a negligent act.” (Affirmation in opposition ¶ 20.) Defendant’s actions cannot, however, be considered as mere acquiescence in that: the police were contacted; Ms. Cosme was contacted; the building was enrolled in the “Clean Halls” program; the outer vestibule door was locked; and any and all information of which Ms. Macri was possessed was turned over to the police department. Under the circumstances, the actions undertaken by the defendant cannot reasonably be construed as negligence. (See People v Campbell, 45 Misc 2d 201, 203 [1965].)
Plaintiff contends further that Real Property Law, article 7, § 231, which provides a landlord with the means to evict a tenant based on drug activity, should have been utilized.
Consideration of plaintiff’s contention, that the defendant’s failure to evict Ms. Cosme is a negligent act, requires speculation that had the defendant attempted to evict Ms. Cosme the proceedings would have terminated in the defendant’s favor and that the proceedings would have been completed before this incident occurred. The speculative nature of this argument is reflected in the affirmation in opposition (¶ 20), wherein counsel argues that “[h]ad the defendant herein taken advantage of this statute, it is possible that the occurrence which led to Officer Kivlehan’s injury would never have occurred.” As such, it does not provide an appropriate basis on which to make a finding of negligence. “In order to succeed, a cause of action *857 must be based on more than speculation.” (Smith v Wisch, 77 AD2d 619, 619 [1980]; see Island Associated Coop, v Hartmann, 118 AD2d 830 [1986]; see also Silva v 81st St. & Ave. A Corp., 169 AD2d 402 [1991].) Moreover, “Conjecture alone does not suffice to defeat a summary judgment motion.” (Rogan v Giannotto, 151 AD2d 655, 656 [1989].)
Further, a “common-law negligence cause of action cannot be predicated upon [the] alleged negligence that created the need for [the plaintiffs] . . . services.” (Rogan, supra at 656.) In Rogan, the plaintiff firefighters alleged a cause of action for common-law negligence as a consequence of the landlord’s failure to maintain operable smoke detectors. The plaintiffs were injured “as they attempted to climb a scuttle ladder which led to the roof” of a building which was adjacent to the building that was burning. (Id.) The Appellate Division, Second Department, reversed the Supreme Court’s denial of summary judgment, and granted the landlord’s application to dismiss the complaint and all cross claims.
In Zanghi v Niagara Frontier Transp. Commn. (85 NY2d 423, 436 [1995]), the Court of Appeals restated its holding in Cooper v City of New York (81 NY2d 584 [1993]) with respect to the application of the firefighter’s rule to a cause of action in common-law negligence. Pursuant to the firefighter’s rule as set forth in Cooper (supra), “police [officers] may not recover in common-law negligence for line-of-duty injuries resulting from risks associated with the particular dangers inherent in that type of employment . . . [The scope of the bar to recovery, the High Court concluded, is that] the firefighter rule precludes a police officer . . . from recovering in tort when the performance of his . . . duties increased the risk of the injury happening, and did not merely furnish the occasion for the injury.” (Zanghi at 436.) The Court in Zanghi (supra at 439) further noted that “Continued application of the bar is presently grounded on the public policy against awarding damages to . . . police for hazards ‘that create a need for their services’ and which they are hired, specially trained and compensated to confront.”
The “determinative factor,” the Court noted, in applying the firefighter rule’s bar is “whether the injury sustained is related to the particular dangers which police officers . . . are expected to assume as part of their duties . . . [The] necessary connection is present where the performance of the police officer’s . . . duties increased the risk of the injury happening, and did not merely furnish the occasion for the injury. In other words, where *858 some act taken in furtherance of a specific police . . . function exposed the officer to a heightened risk of sustaining the particular injury, he or she may not recover damages for common-law negligence.” (Id. at 439.)
In the matter at bar, the plaintiff contends that the defendant’s common-law negligence is based on its failure to remove the drug dealers from the premises. It was the presence of the drug dealers, though, that created the need for the plaintiffs presence. In addition, during the apprehension of the drug dealers, it was exigent circumstances created by the need to assist the officers who were engaged in apprehending the perpetrators that led to the plaintiff sustaining his injuries. Plaintiffs performance of his duties exposed him to “the heightened risk” of his sustaining his injuries. Accordingly, plaintiffs common-law negligence claim fails in this regard as well.
In Kazanoff v United States of Am. (945 F2d 32 [2d Cir 1991]), the Court of Appeals for the Second Circuit in New York had occasion to consider the propriety of summary judgment where a tenant was murdered in her apartment by two nonresident assailants. The men had gained entry into the building when the postal employee exited the lobby through a locked door. The men just walked through when the employee left. The court affirmed a finding of summary judgment on behalf of the defendant United States of America. In pertinent part, the court noted that under New York law, the plaintiff may establish negligence by showing: “(1) the existence of a duty on defendant’s part as to the plaintiff; (2) a breach of that duty; and (3) injury suffered by the plaintiff as a result of that breach. (Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333.)” (Kazanoff, supra at 35.)
The concept of duty and its application, the Kazanoff court noted, was set forth by the New York Court of Appeals in De Angelis v Lutheran Med. Ctr. (58 NY2d 1053, 1055 [1983]) as follows:
“Duty is essentially a legal term by which we express our conclusion that there can be liability ... It tells us whether the risk to which one person exposes another is within the protection of the law. In fixing the bounds of that duty, not only logic and science, but policy play an important role . . .
“A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure *859 to tort liability almost without limit. It is always tempting, especially when symmetry and sympathy would so seem to be best served, to impose new duties, and, concomitantly, liabilities, regardless of the economic and social burden. But, absent legislative intervention, the fixing of the ‘orbit’ of duty, as here, in the end is the responsibility of the courts . . . .” (See also Kazanoff, supra [citations omitted].)
The police department knew that on August 24, 1999, a drug enforcement operation was taking place in front of 2220 Adams Place and should have anticipated that its officers might need an entry key. If the defendant owed a duty to the plaintiff, it was discharged when keys to the outer door were given to his employer for his use.
Plaintiffs second cause of action seeks recovery pursuant to General Municipal Law § 205-e. To assert this cause of action the plaintiff “must identify a statute or ordinance with which the defendant failed to comply and must, in addition, set forth facts from which it may be inferred that the defendant’s negligence directly or indirectly caused harm to the police officer.” (Aversa v New York City Hous. Auth., 233 AD2d 217, 218 [1st Dept 1996] [citation omitted]; see also Florio v City of New York, 226 AD2d 148 [1996].)
General Municipal Law § 205-e (1), in pertinent part, provides that an injured police officer has a right of action if his injury:
“occurs directly or indirectly as a result of any neglect, omission, willful or culpable negligence of any person ... in failing to comply with the requirements of any of the statutes, [or] ordinances ... of . . . city governments . . . [T]he person . . . guilty of said neglect, omission, willful or culpable negligence at the time of such injury . . . shall be liable to pay [such] officer ... a sum of money . . . .”
Said section further provides that the right to recovery exists,
“regardless of whether the injury ... is caused by the violation of a provision which codifies a common-law duty and regardless of whether the injury . . . is caused by the violation of a provision prohibiting activities or conditions which increase the dangers inherent in the work of any officer . . . .” (General Municipal Law § 205-e [3].)
Plaintiff contends that his statutory right of recovery is based on the defendant’s violation of Administrative Code of the City *860 of New York §§ 27-127 (maintenance requirements), 27-128 (owner responsibility), 27-357 (exit requirements: establishes certain exit requirements for different types of buildings), 27-361 (arrangements: exits shall be clearly visible, accessible and unobstructed), 27-371 (doors: requirements for fireproofing and measurements for doors in certain types of buildings), 27-2005 (duties of owner: multiple dwelling to be kept in good repair), 27-2007 (certain specific duties of tenants and others), and Multiple Dwelling Law § 50-a.
Multiple Dwelling Law § 50-a, in pertinent part, provides as follows:
“1. Every entrance from the street . . . to a class A multiple dwelling . . . except an entrance leading to the main entrance hall or lobby which main entrance hall or lobby is equipped with one or more automatic self-locking doors, shall be equipped with automatic self-closing and self-locking doors and such doors shall be locked at all times except when an attendant shall actually be on duty . . .
“2. Every class A multiple dwelling . . . shall also be equipped with an intercommunications system. Such intercommunication system shall be located at an automatic self-locking door giving public access to the main entrance hall or lobby of said multiple dwelling and shall consist of a device or devices for voice communication between the occupant of each apartment and a person outside said door to the main entrance hall or lobby and to permit such apartment occupant to release the locking mechanism of said door from the apartment.” (Emphasis supplied.)
While the above sections are alleged to form the basis of plaintiffs claim pursuant to General Municipal Law § 205-e, it appears from a review of the papers submitted that only Multiple Dwelling Law § 50-a is the one upon which the plaintiff relies.
Plaintiff contends that he was prevented from using the intercom system to gain entry into the building because the outer door was locked, and that the locking of the outer door was in violation of the foregoing highlighted portion of Multiple Dwelling Law § 50-a. Moreover, plaintiff contends that this locked front door proximately caused plaintiffs injuries in that, as a consequence of his having to break the glass to gain entry into the inner vestibule, the plaintiff sustained personal injuries. *861 Plaintiff further contends that defendant’s violation of Multiple Dwelling Law § 50-a, by locking the outer vestibule door, constitutes negligence per se.
In furtherance of his position, plaintiff cites Ragona v Hamilton Hall Realty (251 AD2d 391 [1998]). In Ragona, the plaintiff alleged that she was assaulted in her building lobby because the perpetrator gained access thereto as a result of a broken inner lobby door. The Appellate Division, Second Department, modified the Queens County Supreme Court order and found that plaintiff failed to establish notice of prior criminal activity on the premises so as to put the defendant landlord on notice to take minimal security measures. The Court, however, upheld Supreme Court’s denial of defendant’s motion for summary judgment on the issue of whether a statutory violation occurred. In pertinent part the Court noted that “[t]he defendant [failed to offer a] reason to cause [the] Court to deviate from the generally-accepted principle that the violation of a statute constitutes negligence per se, and the violation of an ordinance constitutes some evidence of negligence.” (Id. at 392.)
In Elliott v City of New York (95 NY2d 730, 734 [2001]), the Court of Appeals noted that “[a]s a rule, violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability ... By contrast, violation of a municipal ordinance constitutes only evidence of negligence.” (Citations omitted.)
In the case at bar it is contended that Multiple Dwelling Law § 50-a was violated by the defendant’s placing of a lock on the outer vestibule door. Consideration of the foregoing language by the Court of Appeals in Elliott (supra) leads to the conclusion that it is a specific duty, imposed by statutory mandate, which must be violated before negligence may be established. The statutory language of Multiple Dwelling Law § 50-a, however, neither mandates a locked outer vestibule door nor prohibits it. The language of that section merely states that public access is to be given to the main entrance or lobby.
It is not disputed that the tenants of the building had a key to unlock the outer door. It is also not disputed that it was the tenants of the building who agreed to, and in fact insisted upon, the locking of the outer door so as to better insure their safety in the building. (Tr. at 24.) Under these circumstances, it would be repugnant to interpret Multiple Dwelling Law § 50-a in a manner that gives public access to the premises a higher priority over safety considerations of the inhabitants of the *862 building. In fact, to render a determination, as urged by the plaintiff, that the landlord owed the plaintiff a duty, under statute, to keep the outer door unlocked, would result in a rendition of that interpretation.
The gist of the section is to provide access to the intercom system for the convenience of the tenants of the building so that they may, from the safety of their residence, determine whether or not they wish to allow a visitor into the building. Here, it was the tenants themselves who, it is not disputed, made a determination that their safety was better served by not allowing public access to the inner door, next to the intercom system, after 10:00 p.m. (Tr. at 24.) Ms. Macri testified that the tenants would make other arrangements with their visitors if they were expecting company after 10:00 p.m. (Tr. at 23.) The court takes judicial notice of the fact that normal package and mail delivery hours have long expired prior to the time at which the outer door is locked. In addition, the defendant’s policy at the time was that if the superintendent saw that drug activity was going on outside of the building and if the individuals involved were making their way into the vestibule, then the superintendent was to lock the outer door after 10:00 p.m. Under these facts, it cannot be said that a statutory violation occurred.
As aforesaid, the purpose of the statute is to afford a measure of protection to the tenants of a residential building. Case research has failed to reveal any decision which has determined that a locked outer door is prohibited by statute. One case determined that a locked outer door is not required. In Robinson v New York City Hous. Auth. (150 AD2d 208 [1989]), the plaintiff contended that the landlord violated Multiple Dwelling Law § 50-a by failing to have a lock on the outer door of the lobby. There was, however, an intercom by an inner locked lobby door. The Appellate Division, First Department, determined that there was no language in Multiple Dwelling Law § 50-a which mandated that the landlord lock the outer vestibule door which leads from the street to an inside intercom. The Court, in dicta, stated that “it would be illogical to require a locked outer door under these circumstances, since such a locked door would prevent visitors and residents, who did not have their keys with them, from reaching the intercom.” (Id. at 209.) While the Court found that a locked outer door would be illogical under the circumstances of the case before it, the Court did not find that the locking of the outer door was specifically prohibited by Multiple Dwelling Law § 50-a.
*863 The matter at bar presents an even more compelling reason to find that there was no violation of Multiple Dwelling Law § 50-a. The plaintiff has failed to refute the defendant’s contention that the police department was given keys to the building. The plaintiff testified at his deposition that he did not know how the other officers gained entry into the building. (Deposition transcript of plaintiff, defendant’s exhibit D, at 29.) It is clear that they did not need to break the glass of the outer door to gain entry to the premises because the plaintiff was injured when he had to do so. The failure of the police department to distribute keys to officers who may need access to the property during their tour of duty cannot and should not be shifted to the defendant herein.
Moreover, this is not a situation where the landlord created a condition which directly caused injury to the plaintiff, like a pothole. The plaintiff was injured in the performance of the duties of his office, which duties, by their very nature, carry the heightened risk of injury when exigent circumstances are present.
“Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.” (Kazanoff, supra at 35.)
In the matter at bar the plaintiff has failed to raise a question of fact as to warrant denial of the motion for summary judgment on both causes of action.
Accordingly, the application is granted in its entirety.